**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

Case No. 20-24044-Civ COOKE/O'SULLIVAN

EDUARDO SOTO, as Personal
Representative of the Estate of
OSVALDO SOTO,

      Plaintiff,

v.

EXPEDIA GROUP, INC.,
BOOKING.COM B.V., BOOKING
HOLDINGS INC.,

      Defendants.
_____/


**<u>AMENDED COMPLAINT FOR DAMAGES</u>**

For years the Soto family[1] owned several business ventures in Cuba, including the famous oceanfront Copacabana Hotel[2] (the "Copacabana"), located at Avenida Primera between 44 and 46 streets, in Havana, Cuba. The Copacabana was inaugurated in 1955, and when Fidel Castro seized power in 1959 and established a communist regime in Cuba, the Copacabana was confiscated in 1961 from the Soto family along with their other properties and business ventures. This forced the Soto family to flee their native country for the United States.

After seizing the Copacabana from the Soto family, the Cuban government, together with Be Live Hotels S.L. ("Be Live"), Expedia,[3] and the Booking Defendants,[4] have exploited and benefitted from the Copacabana for decades without Soto's consent and without paying Soto—the rightful owner—any compensation whatsoever. The defendants have offered and sold reservations at the Copacabana to Floridians through their Florida offices, employees, and marketing campaigns—and through their interactive websites by which they were able to transact business with Floridians 24/7. Defendants' internet and other marketing and promotional efforts were aimed at, and intended to lure and persuade

---

[1] Plaintiff Osvaldo Soto, ("Soto") was an heir to the Copacabana Hotel. Soto died on January 9, 2021 after filing this case. He is substituted as plaintiff by his son, Eduardo Soto, who was appointed Personal Representative of Osvaldo Soto's Estate ("Soto's Estate") on March 4, 2021.

[2] The Copacabana Hotel was also known as the Hotel Copacabana or the Copacabana Yacht Club.

[3] Defendant Expedia Group, Inc., will be referred to as "Expedia."

[4] Defendants Booking Holdings Inc. and Booking.com B.V. will be collectively referred to as the "Booking Defendants."

Floridians to visit Cuba as tourists and stay in the Copacabana.[5] Soto's Estate now sues to right the wrong of defendants' unlawful trafficking in his property and seek compensation.

## THE ACTION

1.     Soto's Estate sues Expedia and the Booking Defendants under the Cuban Liberty and Democratic Solidarity Act, 22 U.S.C. § 6021, *et seq.* (the "Libertad Act"), for unlawful trafficking in Soto's confiscated property in Cuba.

## THE PARTIES

*A.     Plaintiff*

2.     Osvaldo Soto was a United States citizen since September 1967, and was a natural person who resided in Miami, Florida. Osvaldo Soto died on January 9, 2021, after filing the complaint, and is now substituted by Soto's Estate.

*B.     Expedia*

3.     Expedia is a Delaware corporation registered since 1999 with the Florida Department of Corporations to do business in Florida, and with offices at 701 Brickell Ave. Suite 2300. Miami, FL 33131.

*C.     The Booking Defendants*

4.     Defendant Booking Holdings Inc. is a Delaware corporation with offices at 801 Brickell Avenue, Miami FL, 33131, and at 8529 Southpark Cir, Orlando, FL 32819. Booking Holdings is registered with the Florida Department of Agriculture and Consumer Services (FDACS). Booking Holding's FDACS registration (No. ST32150) states that it

---

[5] Defendants attempted to "sanitize" their Cuba operations by removing the Copacabana from their websites. This fact is legally irrelevant, because both defendants trafficked the Copacabana in the two years prior to the filing of this action. *See* 22 U.S.C. § 6084.

does business in Florida as Booking.com (USA) Inc., and other entities. Booking.com

(USA) Inc., is registered since 2012 with the Florida Department of Corporations.

5.      Defendant Booking.com B.V. is a Dutch limited liability company based in

Amsterdam, Netherlands, with its principal place of business in Amsterdam. Booking.com

B.V. is a 100% owned and controlled subsidiary of Booking Holdings, and operates at its

direction. Booking Holdings maintains day-to-day control of Booking.com B.V. and its

basic operations. Booking.com B.V. operates the website Booking.com for the benefit of its

100% owner, Booking Holdings, has no corporate interests of its own and is a mere

instrumentality of Booking Holdings. Booking.com is the website used by Floridians to

purchase reservations at the Copacabana.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction of this action under 28 U.S.C. §

1331 because this action arises under the Libertad Act (22 U.S.C. § 6021 et seq.) and the

amount in controversy exceeds $50,000, excluding interest, costs, attorneys' fees, and treble

damages.

7.      The Court has general jurisdiction over defendants under Fla. Stat. §

48.193(2) because they are engaged in substantial and not isolated activity within this state

by and through their employees, offices and operations in Florida, including their electronic

platforms for marketing and sales transactions with Floridians occurring in the state of

Florida, which constitute continuous and systematic contacts with Florida as more fully set

forth below.

8.      The Court has specific jurisdiction over defendants under Fla. Stat. §§

48.193(1)(a)(1), 48.193(1)(a)(2), and 48.193(1)(a)(6): (a) because they operate, conduct and

carry on business in Florida; have offices in Florida; regularly avail themselves of the benefits of their presence in Florida; committed a tortious act within Florida causing injury to plaintiff who is Floridian; committed tortious acts outside Florida while engaging in solicitation within Florida; (b) because this case arises from defendants' business activity in Florida, tortious conduct in Florida, and tortious conduct outside Florida while engaging in solicitation in Florida, which constitute minimum contacts and satisfy due process; and (c) because a substantial part of the events or omissions (including defendants' unlawful trafficking in Soto's property through their online marketing and sales transactions with Floridians) that give rise to these claims occurred in this judicial District, as more fully described below.

9.      Defendants' extensive trafficking activities in Florida extend far beyond running interactive websites aimed at Floridians where they can research, purchase, and pay for reservations at Cuban hotels on stolen property, including the Copacabana—which alone would be enough. Defendants also: (1) maintain Florida offices from which hundreds of employees contact Florida residents and Cuban hotels regarding reservations booked on defendants' websites; (2) maintain Florida registrations and licenses to do business as sellers of travel in Florida; (3) send direct emails to Florida residents urging them to complete reservations at Cuban hotels they started on defendants' websites, and suggesting other hotels in other parts of Cuba; (4) sell and profit from reservations at Cuba hotels on stolen property, including the Copacabana, to Floridians; and (5) receive substantial revenues from Florida.

**A.      *Defendants Are Physically Present in Florida with Offices and Hundreds of Employees***

10.     Defendants carry on extensive, voluminous, ongoing, systematic, continuous, and substantial daily business activity in Florida:

a.     Defendants maintain Florida offices in which hundreds of employees work, from which they contact Florida residents and Cuban hotels regarding reservations booked on defendants' websites. For example, Expedia Group has a 19,000 square foot office in the Bank of America 33-story tower at 701 Brickell Avenue for one of its divisions (not a separate corporation), Expedia Group Media Solutions.[6]  That office has had over one hundred (100) employees[7] during the relevant time period and offers marketing services relating to Latin America that permit the "geo-target[ing]" of digital ads "to origin cities in Florida," as more fully described below. Also, defendant Booking Holdings (through its subsidiary Booking.com (USA) Inc., by which Booking Holdings is registered to do business in Florida) maintains offices in Miami, at 801 Brickell Avenue, and in Orlando at 8529 South Park Circle, where it has customer service centers with Florida employees whose relevant activities include receiving calls from Floridians about the Copacabana.[8] In fact,

---

[6] *See* Brian Bandell, *INSIDE LOOK: Expedia opens office on Brickell for nearly 100 employees*, S. Fla. Bus. J. (Jan. 13, 2016), https://www.bizjournals.com/southflorida/news/2016/01/12/inside-look-expedia-opens-office-on-brickell-for.html. Moreover, Expedia Group Media Solutions is a partner of Visit Florida, the state's official tourism marketing corporation to promote tourism to Florida. In 2018 alone, Visit Florida's ads on Expedia channels yielded nearly $600 million in bookings. *VISIT FLORIDA Honored with Expedia Group EPIC Award*, Visit Fla., https://www.visitfloridamedia.com/news/corporate-releases/visit-florida-honored-with-expedia-group-epic-award.html (last visited Oct. 1, 2021).

[7] *See supra* n. 6.

[8] *See* photographs of Expedia's office at 701 Brickell Avenue, attached as **Exhibit A**; photograph of the opening of Expedia's office at 701 Brickell Avenue on January 12, 2016, attached as **Exhibit B**; Local Business Tax Receipt for Expedia reflecting an office at 701 Brickell Avenue, attached as **Exhibit C**; Local Business Tax Receipt for Booking.com (USA) Inc., reflecting an office at 801 Brickell Avenue, attached as **Exhibit D**.

"Booking.com's Orlando office is now the company's largest office outside of its Amsterdam base." [9]

      b.    The Booking Defendants' call center in Orlando provides support for Booking's operations with respect to Cuban hotels, including pre- and post-booking contact with clients and hotels.

      c.    Expedia Media Solutions, the Expedia Group marketing division based in Miami*,* designs, implements, and provides metrics on marketing and solicitation, including the use of "micro-targeting," through which it can pinpoint and direct marketing and solicitation to particular geographic areas, down to city level. Expedia touts its ability to do this in Florida.

      d.    Defendants do substantial business every day of the year in Florida, including marketing, research, solicitation, sales and customer service aimed at Floridians.

      e.    Defendants regularly communicate with hotels in Cuba from Florida, including with the Copacabana, regarding reservations booked on defendants' websites.

      f.    Expedia is registered with the Florida Department of State to do business in Florida and has been for more than twenty years. [10]

---

[9] See Robert Silk, *Booking.com expands its Orlando offices*, Travel Weekly (Jan. 13, 2016), https://www.travelweekly.com/Travel-News/Travel-Technology/Bookingcom-expands-its-Orlando-offices; *see also* Anjali Fluker, *Travel firm Booking.com boasts fun, Florida-forward Orlando office*, Orlando Bus. J (Mar. 19, 2018), https://www.bizjournals.com/orlando/news/2018/03/19/travel-firm-booking-com-boasts-fun-florida-forward.html?ana=emailafriend.

[10] *See* copy of the Florida Department of State, Division of Corporations registration for Expedia, attached as **Exhibit E**.

g.      The Booking Defendants' subsidiaries and agents, Booking.com

Customer Service Center (USA) Inc. and Booking.com (USA) Inc., have been registered

with the Florida Department of State to do business in Florida for nearly a decade.[11]

h.      Expedia and Booking Holdings are registered with the Florida

Department of Agriculture and Consumer Services ("FDACS") to do business in Florida;[12]

i.      Expedia "has been a longtime partner with the Florida Chamber of

Commerce" and "has a home here in Florida and has supported economic growth related to

tourism . . ."[13]

j.      Booking.com also is a partner with the Greater Miami Convention &

Visitors Bureau ("GMCVB") serving as its booking engine, and helping the GMCVB

achieve record-breaking revenues during the first six months of this partnership.[14]

k.      Booking Holdings is registered in Florida as a "seller of travel," and its

registration states that it is "doing business as" its agent-subsidiaries.[15]

l.      Defendants receive significant revenues from their activities in Florida.

---

[11] *See* copy of the Florida Department of State, Division of Corporations registration for
Booking.com Customer Service Center (U.S.A.) Inc. and Booking.com (U.S.A.) Inc.,
attached as **Composite Exhibit F**.

[12] Expedia, Inc. is registered under No. ST-31901, and Booking Holdings is registered under
No. ST32150.

[13] *See* Amanda Pedigo, *Expedia is a Partner in Florida Tourism*, Fla. Chamber Comm. (May
30, 2018)  https://www.flchamber.com/expedia-is-a-partner-in-florida-
tourism/#:~:text=Expedia%20Group%2C%20along%20with%20our,strong%20partner%20
in%20Florida%20tourism.

[14] *See* Claudette Covey, *Greater Miami CVB Partners With Booking.com*, Travel Pulse (Aug. 7,
2014), https://www.travelpulse.com/news/travel-technology/greater-miami-cvb-partners-
with-bookingcom.html.

[15] *See* copy of the Florida Department of Agriculture and Consumer Services (FDACS)
registration attached as **Exhibit G.**

**B.**    *Defendants Conduct Their Trafficking in Florida and Target Floridians*

11.    Defendants use sophisticated internet marketing systems to target and solicit Floridians to make reservations at hotels built on stolen property in Cuba (including the Copacabana).[16] Defendants' continuous and systematic efforts to reach out to Floridians are concrete and quantifiable. Discovery in related cases showed that between November 2017 and June 2019 alone, the Booking Defendants sent thousands of emails to Floridians who searched for hotels in Varadero, Cuba.

12.    Defendants use their sophisticated websites to send follow up "you forgot something" emails to Floridians who browse hotels in Cuba on defendants' websites, but do not make reservations, soliciting and urging them to make reservations, including, reservations at the Copacabana. Discovery in related cases also shows that between October 2017 and June 2019 alone, the Booking Defendants sent thousands of emails to Floridians who abandoned shopping carts that included hotel reservations in Cuba.

13.    Defendants send direct correspondence to persons whom defendants know are located in Florida.

14.    Defendants directly target Floridians for advertising, for example, through Expedia Group Media Solutions, using its touted ability to micro-target by geographic area.

15.    Defendants also target Floridians directly for advertising through Expedia Local Expert, and through its more than 100 concierge service spots located in Orlando, Florida.[17]

---

[16] *See* email dated February 9, 2020, from by Booking.com to Manuel Vazquez, a Floridian, offering reservations in various cities in Cuba, attached as **Exhibit H**.

[17] *See TransFirst Media, Inc. Partners with Expedia Local Expert® Orlando*, Newswire (Nov. 15, 2016), https://www.newswire.com/news/transfirst-media-inc-partners-with-expedia-local-expert-orlando-16960243.

16.    Defendants configure their landing pages (web pages that users see upon entering defendants' websites) for Floridians who have searched for hotels in Cuba, including, the Copacabana, to Floridians to this and other Cuban hotels related to their search.

**C.    *Defendants Solicited, Marketed, and Made Sales to Floridians over Robust Interactive Websites Designed and Intended to Make Those Sales to Floridians***

17.    Defendants' websites are fully interactive, have robust internet e-business capabilities, and are fully accessible in Florida. Floridians can readily access defendants' websites and are able to book hotel accommodations in Cuba at more than 6,500 hotels, including the Copacabana. The defendants' websites allow Floridians to browse hotels by, among other things, geographic location (including Havana), by hotel operator (including Be Live, the operator of the Copacabana), and by hotel name (including the Copacabana).

18.    After locating a hotel in Cuba on one of the defendants' websites, Floridians are readily able to determine whether hotel rooms are available on the preferred dates, at what price and with what features (e.g., types of rooms, beds, views, etc.), and can reserve rooms on defendants' websites using U.S. credit cards. If Floridians do not reserve a room after browsing defendants' websites, the defendants target them and send emails with other hotel options in Cuba, including the Copacabana. For example, on July 19, 2019, after Manuel Vazquez, a Floridian, searched on Booking.com for hotels in Cienfuegos, Cuba, the Booking Defendants sent him an email inviting him to look at other hotels in Cienfuegos, stating: "Manuel, Cienfuegos is calling your name."[18] Both Expedia and the Booking

---

[18] *See* email dated July 19, 2019 from Booking.com to Manuel Vazquez, Floridian, offering reservations at various hotels in Cienfuegos, Cuba, attached as **Exhibit I**.

Defendants targeted Floridians by sending them emails urging them to book rooms at hotels in Cuba, including at the Copacabana.

19.    The defendants promote their websites—and their interactive capabilities for booking rooms at Cuban hotels, including the Copacabana—on the internet to Floridians in the following ways:

a.    through their search engine optimization (SEO) efforts, including by developing titles and meta description tags to optimize the titles and "snippets" that appear on Google and other search engine results pages;

b.    through their follow-up emails to Floridians who have searched for accommodations in Cuba, including the Copacabana or other geographically proximate hotels; and

c.    through banner ads promoting popular destinations in Cuba that direct Floridians to additional information regarding reservations at Cuban hotels, including the Copacabana.

D.    ***Defendants' Florida Contacts Resulted in Reservations at the Copacabana***

23.    As a direct result of defendants' continuous and systematic contacts with Florida and their widespread efforts to promote and sell reservations to Floridians:

a.    Floridians have booked a substantial number of stays at the Copacabana through defendants' websites.

b.    Using their Florida operations and websites, defendants have made a substantial number of sales to Floridians, including sales of reservations at the Copacabana. Defendants' revenue from their sales of reservations in Florida to Floridians for stays in Cuba is widespread and substantial.

24.     Defendants receive commissions for each of these reservations. That commission revenue is substantial.

25.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2) and (3).

## THE LIBERTAD ACT

26.     The Libertad Act was passed on March 12, 1996. One of its express purposes is to deter the exploitation of wrongfully confiscated property in Cuba belonging to United States nationals by "protect[ing] United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro Regime." 22 U.S.C. § 6022(6).

27.     Title III of the Libertad Act provides U.S. nationals whose property in Cuba was confiscated by the communist Cuban regime with a right of action against those who traffic and those who benefit from trafficking, as defined by 22 U.S.C. § 6023(13), in that property. *Id.* At 22 U.S.C. §§ 6081-6085.

28.     Title III's effective date was August 1, 1996. Defendants' liability for trafficking under Title III has been "established irreversibly" in the years since.

29.     Since the Libertad Act's passage in 1996, defendants have been on notice that trafficking in property confiscated by the communist Cuban regime without the consent of, and compensation to, the owner of a claim to the property could render the defendants subject to liability for well-established, common-law claims such as unjust enrichment, tortious interference, and after-the-fact aiding and abetting. The Libertad Act was passed to provide an effective remedy for this infringement of property rights.

30.     Soto's Estate now sues defendants, who have trafficked in Soto's confiscated property and have benefitted from others' trafficking, under the Libertad Act.

## FACTUAL ALLEGATIONS

### A.     *The Trafficked Property*

31.     The Libertad Act expressly defines "property" to include "any property . . .
whether real, personal, or mixed, and any present, future, or contingent right, security, or
other interest therein, . . . ." *Id.* at § 6023(12)(A).

32.     The Soto family owned several business ventures throughout Cuba, including
the famous oceanfront Copacabana, located at Avenida Primera between 44 and 46 streets,
in Havana, Cuba.

33.     The Copacabana became a well-known and profitable waterfront hotel with
luxurious yacht club.

34.     Soto's predecessors continuously owned, possessed, and used the
Copacabana until the communist Cuban government confiscated it in 1961. Thereafter,
many Soto family members fled Cuba to Florida, where they have lived ever since.

35.     The Libertad Act defines the term "confiscated" to include the
"nationalization, expropriation, or other seizure by the Cuban government of ownership or
control of property, on or after January 1, 1959—(i) without the property having been
returned or adequate and effective compensation provided." 22 U.S.C. § 6023(4)(A)(i).

36.     The Cuban government maintains possession and control of the Copacabana
and it has never returned it nor paid any compensation to plaintiff for its seizure.

37.     The Cuban government, together with foreign hotel operators, have
continued to operate and benefit from the Copacabana, and the Copacabana has been the
subject of dealings between defendants and the Cuban government.

38.     At all times material to this action, the defendants solicited and sold reservations at the Copacabana including, in large part, to Floridians. Floridians could reserve vacation packages at the Copacabana from the defendants' websites.

39.     Soto never abandoned his legitimate interest in and claim to the Copacabana, and, at the time of filing this lawsuit and now through Soto's Estate, has been the rightful owner of the Copacabana, which is stolen property under the Libertad Act, which provides a remedy for defendants' trafficking and benefitting from others' trafficking.

**B.      Succession Rights to the Copacabana**

40.     The Copacabana was inaugurated by Antonio J. Soto y Castellanos in 1955.

41.     Antonio J. Soto y Castellanos died a Cuban citizen on May 27, 1962 in Miami. His wife Maria Teresa Polo y Fernandez became a U.S. citizen in the late 1970s.

42.     Upon the passing of Antonio J. Soto in 1962, his entire interest in the property passed to his wife Maria Teresa by intestate succession. When Maria Teresa died in 1983, her entire interest in the Copacabana was distributed by intestate succession in equal parts to their five children, Antonio J. Soto II, Orlando Soto, Margarita Abril, Maria Teresa Corripio, and Osvaldo N. Soto.

43.     Since its confiscation, and as of the time of filing this lawsuit, the Soto Family, subsequently Osvaldo N. Soto, and now Soto's Estate, have been the rightful owners of the claim to the Copacabana.

44.     The Soto family was not eligible to file a claim with the Foreign Claims Settlement Commission under Title V of the International Claims Settlement Act of 1949 (22 U.S.C. § 1643, et seq.), because they were not U.S. citizens at the time the Copacabana was confiscated.

45.     Soto did not previously have an opportunity to bring this action because, until

May 2, 2019, private rights of action under Title III were suspended pursuant to the

authority given by Congress to the President of the United States under the Libertad Act.[19]

**C.     *Expedia and the Booking Defendants Have Trafficked in the Copacabana Without Authorization and Without Compensating Soto***

46.     The Libertad Act defines a person who "traffics in confiscated property" as

one who

> knowingly and intentionally— . . . (ii) engages in a commercial activity using
> or otherwise benefiting from confiscated property, or (iii) . . . participates in, or
> profits from, trafficking (as described in clause (i) or (ii)) by another person, or
> otherwise engages in trafficking (as described in clause (i) or (ii)) through
> another person, without the authorization of any United States national who
> holds a claim to the property.

22  U.S.C. § 6023(13)(A).

<u>*Defendants' Knowledge and Intentionality*</u>

47.     Since the Libertad Act's enactment in 1996, defendants have been on notice

that trafficking in the Copacabana, which was publicly known to have been confiscated by

the Cuban government, would subject them to liability:

> I will allow Title III to come into force. ***As a result, all companies doing business
> in Cuba are hereby on notice that by trafficking in expropriated American property,
> they face the prospect of lawsuits and significant liability in the United States.***
>
> &ast;  &ast;  &ast;
>
> Our allies and friends will have a strong incentive to make real progress
> because, ***with Title III in effect, liability will be established irreversibly during the
> suspension period and suits could be brought immediately when the suspension is
> lifted***. And for that very same reason, foreign companies will have a strong
> incentive to immediately cease trafficking in expropriated property, the only
> sure way to avoid future lawsuits.

---

[19] Twenty-three (23) years of Presidential suspension of Title III, until May 2, 2019,
equitably tolled its March 12, 1996 date for measuring ownership and citizenship until that
suspension was lifted on May 2, 2019.

President's Statement on Action on Title III of the Cuban Liberty and Democratic Solidarity Act of 1995, 32 Weekly Comp. Pres. Doc. 1265 (July 16, 1996) (G.P.O. authenticated version available at www.govinfo.gov/content/pkg/WCPD-1996-07-22/pdf/WCPD-1996-07-22-Pg1265.pdf). President Clinton's statement rendered defendants' conduct knowing and intentional as a matter of law.

48.     Further, Soto informed the Booking defendants on November 22, 2019, and Expedia on September 16, 2020, of his intent to commence an action unless defendants ceased to traffic in the Copacabana, in compliance with 22 U.S.C. § 6082(a)(3)(D). *See* **Composite Exhibit J**. Thus, defendants have had actual knowledge of plaintiff's claim to the Copacabana since at least November 22, 2019, and September 18, 2020.

49.     Despite being on actual notice, defendants continued to market and make reservations at the Copacabana for their economic benefit.

### *Defendants' Lack of Authorization*

50.     Neither Soto nor any other U.S. national, if any, who may have had a claim to the property, ever authorized the Cuban government or defendants to traffic in the Copacabana.

### *Defendants' Failure to Pay Compensation to Plaintiff*

51.     The defendants have never paid—and Soto never has received—any compensation or indemnification whatsoever for defendants' trafficking of the Copacabana.

52.     Soto was injured by defendants' trafficking in the Copacabana without his permission, and without paying any compensation to him. The defendants have been unjustly enriched from their trafficking in the Copacabana.

## *Expedia's Trafficking*

53.     Since at least November 2017, Expedia knowingly and intentionally participated in trafficking the Copacabana, which had been confiscated by the communist Cuban regime.

54.     Expedia's knowing and intentional conduct regarding the confiscated Copacabana constitutes trafficking as defined in 22 U.S.C. § 6023(13)(A).

55.     Expedia trafficked in the Copacabana until at least June 2019.

56.     Expedia is the corporate parent company of numerous brands. In fact, Expedia lists a total of 21 subsidiaries or affiliates, through which it maintains more than 200 travel booking sites across more than 70 countries, and through which it offers more than 1 million properties for rent.



https://web.archive.org/web/20200722194307/https://www.expediagroup.com/about/ (last visited Oct. 1, 2021).

57.     According to Expedia's most recent 10-K filing, Expedia "make[s] travel products and services available both on a stand-alone and package basis, primarily through the following business models: the merchant model, the agency model and the advertising

model." Expedia Group, Inc., Annual Report (Form 10-K) (Feb. 12, 2021) at 4, *available at*

https://www.expediagroup.com/investors/financial-information/sec-filings/default.aspx.

> Under the merchant model, we facilitate the booking of hotel rooms, alternative accommodations, airline seats, car rentals and destination services from our travel suppliers and we are the merchant of record for such bookings. The majority of our merchant transactions relate to hotel bookings. Under the agency model, we facilitate travel bookings and act as the agent in the transaction, passing reservations booked by the traveler to the relevant travel provider. We receive commissions or ticketing fees from the travel supplier and/or traveler.
>
>          \*       \*       \*
>
> Under the advertising model, we offer travel and non-travel advertisers access to a potential source of incremental traffic and transactions through our various media and advertising offerings on trivago and our transaction-based websites.

*Id.* at 6.

58.     At times relevant to this case, Expedia provided online booking services for

hotels in Cuba, including the Copacabana. For example, Expedia.com has listed at least

**5,073** properties available for rent throughout Cuba. *See* Screenshot of Expedia Mobile

Application, attached as **Exhibit K.** These properties included the Copacabana.

59.     In addition to directly benefitting from trafficking the Copacabana by

receiving commissions or other fees for booking rooms there, Expedia also derived an

indirect benefit from trafficking the Copacabana by receiving advertising revenues driven by

or related to their offering and selling reservations at the Copacabana.

60.     Many of Expedia's customers (including Floridians) traveled to Cuba, and to

the Copacabana in particular, for tourism, which is not a permitted purpose of travel to

Cuba under the U.S. Treasury Department regulations, and is thus, not lawful travel.

61.     Expedia advertised hotels including the Copacabana to Floridians for

tourism, in violation of the U.S. Treasury Department regulations:

> **The Best Havana Hotels on the Beach from $111 - Expedia**
>
> Enjoy the sun and breeze in one of our 10 beach hotels & resorts in Havana. Book your waterfront hotel today and pay later with Expedia.

*See* screenshot of Expedia's landing page after a google search from Florida by a Floridian for adventure hotels in Havana, attached as **Exhibit L**; *see* screenshot of Expedia's offering of "Top Cuba Fishing Resorts and & Hotels," from an online search done in Florida by a Floridian, attached as **Exhibit M**; and "Searching online for all-inclusive hotel accommodation in Havana? This tropical destination has a selection of all-inclusive hotels and other accommodations . . . ." *See* screenshot of Expedia's results from a Google search from Florida, attached as **Exhibit N**.

62.     Expedia.com told Floridians that Havana, where the Copacabana is located, is known for its beaches, parks and museums:

> **Sightseeing In and Around Havana**
>
> Venture out to Ernest Hemingway Museum and National Botanical Garden and see why travelers like Havana! Other attactions include ExpoCuba, Lenin Park, and Ernest Hemingway Monument.

> **Havana is also known for its:**

> - Jazz
> - Skyscrapers
> - Marina
> - Monuments
> - Opera

*See* **Exhibit O**. Expedia's advertisement of hotels in Havana to Floridians for tourism violated U.S. Treasury Department regulations.

20

*The Booking Defendants' Trafficking*

63.     Since at least November 2017, the Booking Defendants knowingly and intentionally participated in trafficking the Copacabana, which had been confiscated by the communist Cuban government.

64.     The Booking Defendants' knowing and intentional conduct regarding the confiscated Copacabana is trafficking as defined in 22 U.S.C. 6023(13)(A).

65.     The Booking Defendants trafficked in the Copacabana until at least June 2019.

66.     Booking Holdings is the corporate parent company for a number of brands, including Booking.com, Kayak, Priceline, Agoda, Rentalcars.com, and OpenTable. Booking Holdings Annual Report (Form 10-K) (Feb. 24, 2021) at 1. Booking Holdings is the 100% owner of Booking.com B.V., as reflected in its Consolidated Financial Statement. *Id.* at Ex. 21.

67.     According to Booking Holdings, its "business is driven primarily by international results, which consist of the results of Booking.com, Agoda, and Rentalcars.com and the international business of KAYAK and OpenTable." *Id.* at 2. "Booking.com is the world's leading brand for booking online accommodation reservations, based on room nights booked, with operations worldwide and headquarters in the Netherlands." *Id.* at 4. Booking Holdings' "international business (the substantial majority of which is generated by Booking.com) represented approximately 88% of [the Booking Defendants'] consolidated revenues." *Id.* at 2.

68.     According to Booking Holdings, "[w]e connect consumers wishing to make travel reservations with providers of travel services around the world through our online platforms" and "[t]hrough one or more of our brands, consumers can: book a broad array of

accommodations (including hotels, motels, resorts, homes, apartments, bed and breakfasts, hostels and other properties) . . . ." *Id.* at 41. Booking Holdings conducts this business through its "brands," including, primarily, Booking.com B.V. On information and belief, Booking.com B.V., the operator of the Booking.com website, acts as an agent of its 100% owner Booking Holdings Inc., which has operational control over the day-to-day activities of Booking Holdings B.V., and whose executives are compensated in part based on the performance of Booking.com B.V.

69.     The Booking Defendants operate under both an agency model and a merchant model:

- Agency revenues are derived from travel-related transactions where we do not facilitate payments from travelers for the services provided. We invoice the travel service providers for our commissions after travel is completed. Agency revenues consist almost entirely of travel reservation commissions.

- Merchant revenues are derived from travel-related transactions where we facilitate payments from travelers for the service provided, generally at the time of booking. Merchant revenues include travel reservation commissions and transaction net revenues (i.e., the amount charged to travelers less the amount owed to travel service providers) in connection with our merchant reservation services; credit card processing rebates and customer processing fees; and ancillary fees, including travel-related insurance revenues. Substantially all merchant revenues are derived from transactions where travelers book accommodation reservations or rental car reservations.

*Id*. at 2. Under these models, along with advertising through KAYAK, Booking Holdings had annual revenues of $6.8 billion. *Id.* at 2. 88% of that amount is attributable to the operations of Booking.com. This revenue is reflected in Booking Holdings Consolidated Financial Statements. *Id.* at 77-128. On information and belief, all revenues earned by Booking Holdings' subsidiaries, including Booking.com B.V., flow directly to Booking Holdings, which has no independent business or independent revenues other than those of its subsidiaries.

70.     In addition to directly benefitting from trafficking the Copacabana by receiving commissions or other fees for booking rooms at the Copacabana, the Booking Defendants also derived an indirect benefit from the Copacabana by receiving advertising revenues driven by or related to their offering and selling reservations at the Copacabana.

71.     At all times relevant to this case, the Booking.com Defendants provided online booking services for hotels in Cuba, including the Copacabana. For example, Booking.com listed at least **5,793** properties available for rent throughout Cuba. See Screenshot of Booking.com, attached as **Exhibit P**.

72.     On information and belief, many of the Booking Defendants' customers (including Floridians) traveled to Cuba, and to the Copacabana in particular, for tourism, which is not a permitted purpose of travel to Cuba under the U.S. Treasury Department regulations and is thus not lawful travel.

73.     The Booking Defendants have advertised hotels in Cuba to Floridians for tourism, in violation of the U.S. Treasury Department regulations. *See* screenshot of the results page from a Bing search done from Florida, where Booking.com offers "The 10 Best Family Hotels in Cuba Check out our selection of great kid-friendly hotels in Cuba . . . After a day of hiking or fishing, guests can relax in the garden or in the shared lounge area," when Floridians search for "BEST FISHING HOTELS IN CUBA," attached as **Exhibit Q**.

### *Plaintiff's Injury*

74.     Plaintiff's claims arise from defendants' Florida advertising, solicitations and sales of rooms to Floridians at the Copacabana.

75.     Plaintiff's injury is defendants' trafficking in the Copacabana, which constitutes an invasion of a legally protected interest.

76.   Defendants' offering of and sale of reservations at the Copacabana constitutes a concrete and tangible infringement on Soto's property rights.

77.   Plaintiff suffered his injury in Florida, where he resides.

78.   Plaintiff's injury is real, tangible and concrete because he is receiving no benefit from his interest in the Copacabana, which defendants trafficked for money, without plaintiff's consent and without paying him any compensation.[20]

79.   Because of defendants' unlawful trafficking of the Copacabana, defendants are liable to plaintiff for all money damages allowable under 22 U.S.C. § 6082(a).

## CAUSE OF ACTION

### Private Right of Action Under 22 U.S.C. § 6082(a)(1)

80.   Soto' Estate incorporates by reference paragraphs 1 to 79 into this count.

81.   This claim is brought under Title III of the Libertad Act, 22 U.S.C. § 6082-6085.

82.   Defendants are "persons" as defined by 22 U.S.C. § 6023(11).

83.   The Copacabana was confiscated by the communist Cuban government.

84.   Since the date the Copacabana was confiscated, the Soto Family, subsequently Soto, and now Soto's Estate, have owned a claim to the Copacabana.

---

[20] Title III makes it clear that "[t]he wrongful confiscation or taking of property belonging to United States nationals by the Cuban Government, and the subsequent exploitation of this property at the expense of the rightful owner," 22 U.S.C. §§ 6081(2)-(3), by foreign investors who traffic in confiscated properties "complicate any attempt to return [these expropriated properties] to their original owners," 22 U.S.C. §§ 6081(5), (7), and undermine U.S. foreign policy aiming "to protect the claims of United States nationals who had property wrongfully confiscated by the Cuban Government," *id.* § 6081(6)(B).

85.     Defendants knowingly and intentionally used and benefitted, directly and indirectly, from the Copacabana by soliciting and selling, for economic benefit, reservations at the Copacabana, which constitutes trafficking that violates Title III of the Libertad Act.

86.     Defendants conducted this trafficking "without the authorization of any United States national who holds a claim to the property" (22 U.S.C. § 6023(13)) in violation of Title III of the Libertad Act.

87.     Soto, in compliance with 22 U.S.C. §§ 6082 (a)(3)(B) and (a)(3)(D), gave notice to the defendants more than 30 days before joining them as defendants in this action. Notwithstanding this notice, the defendants continued to knowingly and intentionally traffic in the Copacabana.

88.     Accordingly, Soto's Estate has a right to recover damages, to be determined under 22 U.S.C. § 6082(a)(1)(A)(i), and 6082(a)(3)(C), together with attorneys' fees and costs under 22 U.S.C. § 6082(a)(1)(A)(ii), and treble damages under U.S.C. § 6082(a)(3).

89.     Before this action was filed, On May 2, 2019, the United States Government ceased suspending the right to bring an action under Title III, 22 U.S.C. § 6085, which permits plaintiff to seek the relief requested here.

## PRAYER FOR RELIEF

For these good and sufficient reasons, Soto's Estate demands a judgment against defendants that:

      i.     Awards actual damages under 22 U.S.C. § 6082(a)(1)(A)(i);

     ii.     Awards attorneys' fees and costs under 22 U.S.C. § 6082(a)(1)(A)(ii);

   iii.     Awards treble damages under 22 U.S.C. § 6082(a)(3)(C);

   iv.     Awards appropriate post-judgment interest; and

       v.     Awards such other relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on all issues so triable.

Dated: October 1, 2021

Respectfully submitted,

**RIVERO MESTRE LLP**
2525 Ponce de León Blvd., Suite 1000
Coral Gables, Florida 33134
Telephone: (305) 445-2500
Fax: (305) 445-2505
E-mail: arivero@riveromestre.com
E-mail: arolnick@riveromestre.com
E-mail: amalave@riveromestre.com
E-mail: strujillo@riveromestre.com


By:      s/ Andrés Rivero
           ANDRÉS RIVERO
           Florida Bar No. 613819
           ALAN H. ROLNICK
           Florida Bar No. 715085
           ANA MALAVE
           Florida Bar No. 83839
           SYLMARIE TRUJILLO
           Florida Bar No. 112768


and

MANUEL VAZQUEZ
Florida Bar No. 132826
**MANUEL VAZQUEZ, P.A.**
2332 Galiano St., Second Floor
Coral Gables, Florida 33134
Telephone: (305) 445-2344
Facsimile: (305) 445-4404
E-mail: mvaz@mvazlaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on October 1, 2021, I electronically filed this document with the Clerk of the Court using CM/ECF. I also certify that this document is being served today on all counsel of record by transmission of Noticed of Electronic Filing generated by CM/ECF.

   s/ Andrés Rivero     
ANDRÉS RIVERO
